UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| HENRY IVERS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil No. 20cv10507-LTS |
| | ) | |
| LINCOLN NATIONAL LIFE INSURANCE COMPANY, | ) ) ) | |
| | ) | |
| Defendant. | ) ) | |

MEMORANDUM AND ORDER ON MOTIONS TO DISMISS, TO CORRECT,
FOR SUMMARY JUDGMENT, AND FOR LEAVE TO FILE A SUR-REPLY
(DOC. NOS. 8, 10, 11, 12, 24)

August 12, 2020

SOROKIN, J.

Pro se plaintiff Henry Ivers purchased a deferred variable annuity contract from Defendant Lincoln National Life Insurance Company. See Doc. No. 1-1 ¶ 5.[1] Ivers brings this action alleging that his annuity contract "included a 'guaranteed minimum interest rate account,'" and that Lincoln "breached [its] contract by removing the contractually required 'guaranteed minimum interest rate account.'" Id. ¶¶ 5, 6. His single-page complaint also, arguably, asserts a claim under Chapter 93A of the Massachusetts General Laws. Id. ¶ 1 (second).

Now pending before the Court are Defendant's motion to dismiss (Doc. No. 8), Plaintiff's motions to correct (Doc. Nos. 10, 11), Plaintiff's motion for summary judgment (Doc. No. 12), and Plaintiff's motion for leave to file a sur-reply to Defendant's motion to dismiss (Doc. No. 24).

---

[1] Citations to "Doc. No. __" reference documents appearing on the court's electronic docketing system; pincites are to the page numbers in the ECF header.

The motions are fully briefed. At the outset, the Court ALLOWS AS UNOPPOSED Plaintiff's motions to correct certain errors in his opposition to Defendant's motion to dismiss (Doc. Nos. 10, 11) and also ALLOWS Plaintiff's motion for leave to file a sur-reply to Defendant's motion to dismiss, which document is already before the Court (see Doc. No. 28).

Turning to the substantive motions, the Court considers first Defendant's motion to dismiss (Doc. No. 8) and ALLOWS that motion. The Court then considers Plaintiff's motion for summary judgment (Doc. No. 12) and DENIES that motion.

I.  BACKGROUND

The Court draws the facts from the single paged complaint, the exhibits thereto, the unchallenged copies of the contract before the Court,[2] and basic factual events, to the extent not set forth in the spare complaint, as described in Ivers's pleadings in response to the motion to dismiss and in his motion for summary judgment. The parties agree that the issue before the Court is an issue of contract interpretation.

Ivers purchased an American Legacy Shareholders Advantage deferred variable annuity contract from Lincoln, effective November 8, 2007. See Doc. No. 9-1 (Annuity Contract). The Annuity Contract provides that "[t]he Contract and any riders attached constitute the entire Contract." Id. at 35. The Rider, in turn, provides that "[t]his Rider is part of the Contract to which it is attached and is effective upon issue. In the case of a conflict with any provision of the Contract, the provisions of this Rider will control." Id. at 45.

---

[2] In deciding a Rule 12(b)(6) motion, a court may "consider documents the authenticity of which [is] not disputed by the parties; . . . documents central to plaintiffs' claim; [and] documents sufficiently referred to in the complaint . . . even when the documents are incorporated into the movant's pleadings." Lambert v. Fiorentini, 949 F.3d 22, 26 (1st Cir. 2020) (internal quotation marks and citations omitted).

The Annuity Contract allows the purchaser to fund the annuity and then receive periodic annuity payments. See generally id. One of the investment options into which the purchaser may make allocations under the Annuity Contract, and the only one at issue here, is an Interest Adjusted Fixed Account, the terms of which are set forth in the Interest Adjusted Fixed Account Rider. Id. at 45-49. The Interest Adjusted Fixed Account may be comprised of as many as ten Fixed Subaccounts, each of which "accepts allocations for a Guaranteed Period at a Guaranteed Interest Rate. There is a separate Fixed Subaccount for each Guaranteed Period." Id. at 45. There are ten such Subaccounts: 1-Year Initial Guaranteed Period, 2-Year Initial Guaranteed Period, 3-Year Initial Guaranteed Period, 4-Year Initial Guaranteed Period, 5-Year Initial Guaranteed Period, 6-Year Initial Guaranteed Period, 7-Year Initial Guaranteed Period, 8-Year Initial Guaranteed Period, 9-Year Initial Guaranteed Period, 10-Year Initial Guaranteed Period. Id. at 17-18.

"Each individual amount allocated to a Fixed Subaccount will have an associated Guaranteed Period, Guaranteed Interest Rate and Expiration Date and will be treated separately from other amounts allocated to the Fixed Subaccount. . . . The Guaranteed Period begins when the amount is allocated to that Fixed Subaccount and ends on the Expiration Date for the Guaranteed Period selected." Id. at 46. "The Guaranteed Interest Rate will be guaranteed for the duration of the applicable Guaranteed Period." Id.

Each subaccount is defined by its "Guaranteed Period," which is the "length of the period during which an initial or subsequent Guaranteed Interest Rate will be credited [i.e. between 1 and 10 years]. The Guaranteed Period is selected by the Owner from those made available by LNL at the time of selection." Id. at 45. The "Guaranteed Interest Rate" is the "effective annual rate of interest LNL guarantees to credit on assets in each Fixed Subaccount." Id. The Guaranteed Interest Rate is 1.75% (for deposits made in contract years 1-6) and 3% (for deposits made in

contract years 7 and later). Id. at 17. The Rider also provides that Lincoln "reserves the right to discontinue accepting new allocations or transfers to any of the available Guaranteed Periods at any time." Id. at 45.

Sometime in 2010, Lincoln exercised its right under the Annuity Contract to close the Fixed Subaccounts to new allocations or transfers. Doc. No. 1-1 ¶ 6; Doc. No. 1-4 at 4 (December 3, 2019 letter from Ivers stating that "in or around 2010, [Lincoln] began removing the contractually required 3% guaranteed minimum interest rate accounts."); Doc. No. 20-2 at 31 (April 16, 2018 letter from Lincoln to Ivers stating that "[i]n accordance with the contract terms, [Lincoln] elected to stop accepting new deposits and transfers into the 3% Fixed Account in September 2010.").[3] Ivers disputes that Lincoln has the right to close these accounts to new allocations or transfers.

On April 17, 2017, Lincoln allowed Ivers to transfer $412,009 from another available account to the 3% Fixed Account. Doc. No. 20-2 at 31. Lincoln states that on November 16, 2017 it realized that this transfer occurred due to what it describes as a servicing error when Ivers attempted to transfer additional funds into the 3% Fixed Account. Id. At that point, Lincoln informed Ivers that the Fixed Account was no longer available for new deposits or transfers.[4] Id. This action ensued.

---

[3] The Complaint omits any reference to the timing of the alleged breach, see generally Doc. No. 1-1, but the 93A demand letter attached to the Complaint, Doc. No. 1-4, makes reference to the timing, id. at 4, 7, 11, 16-18. In addition, Ivers has opposed the motion to dismiss on the grounds that the events described in the 93A letter and cited in the text above constitute breaching events. In the absence of these facts, the complaint would fail to set forth a short and plain statement of the claim as required by Rule 8 for it would give no indication as to the factual basis for the alleged breach. Thus, under all of these circumstances, the Court considers the facts described in the text above.

[4] The Court considers these facts on the basis described in footnote 3. Whether Lincoln made the April 17, 2017 transfer due to a servicing error or for some other reason is not material to the resolution of the pending motions.

II.     LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a complaint must contain sufficient factual matter, accepted as true, to "state a claim for relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)). Courts must "take all factual allegations [in the Complaint] as true and . . . draw all reasonable inferences in favor of the plaintiff." Rodríguez-Ortiz v. Margo Caribe, Inc., 490 F.3d 92, 96 (1st Cir. 2007). In reviewing the complaint, the Court may consider documents attached to or fairly incorporated into the complaint and facts susceptible to judicial notice. Schatz v. Republican State Leadership Comm., 669 F.3d 50, 55 (1st Cir. 2012).

Summary judgment is only appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

III.    DISCUSSION

The parties agree that their dispute centers on a single question of contract interpretation: whether the Annuity Contract permits Defendant to make all subaccounts unavailable for new deposits. Both Defendant's motion to dismiss (Doc. No. 8) and Plaintiff's motion for summary judgment (Doc. No. 12) raise the same question of law.[5] The Court addresses each in turn.

---

[5] In its motion to dismiss, Defendant also argued that Plaintiff's claim is time-barred. See Doc. No. 9 at 11-12. In its reply, however, in light of certain representations made by Plaintiff as to when he first became aware of the alleged breach of contract, Defendant urges that the Court need not address the issue of whether the complaint is time-barred to resolve the motion on the merits. See Doc. No. 19 at 12, 13. The Court therefore does not address this issue.

A.     Defendant's Motion to Dismiss (Doc. No. 8)

1. Ivers's Breach of Contract Claim

Ivers contends that Lincoln breached the Annuity Contract when it ceased allowing new allocations or transfers to be made to the Fixed Interest Subaccounts. Doc. No. 1-1 ¶¶ 5-6.

"Under Massachusetts law, contract interpretation is a question of law for the court unless the contract is ambiguous." Nicolaci v. Anapol, 387 F.3d 21, 26 (1st Cir. 2004). Contracts must be interpreted holistically, with each clause and provision examined and construed in light of all other clauses and provisions. Fin. Res. Network, Inc. v. Brown & Brown, Inc., 867 F. Supp. 2d 153, 177 (D. Mass. 2012) (citing Cofman v. Acton Corp., 958 F.2d 494, 498 (1st Cir. 1992) and In re 604 Columbus Ave. Realty Trust, 968 F.2d 1332, 1357 (1st Cir. 1992)).

"A contract is ambiguous if 'an agreement's terms are inconsistent on their face or where the phraseology can support reasonable differences of opinion as to the meaning of the words employed and obligations undertaken.'" Nicolaci, 387 F.3d at 26 (quoting Lohnes v. Level 3 Communications, Inc., 272 F.3d 49, 53 (1st Cir. 2001) (citation omitted). "The question whether a contract term is ambiguous is one of law for the court. . . . Ambiguity is not created merely because the litigants disagree about the meaning of a contract." Id. (citations omitted). An unambiguous contract "leaves no question of fact to be resolved, and the contract must be enforced according to its terms." Id. at 27.

Here, the Annuity Contract is unambiguous. The Annuity Contract specifically provides that Lincoln may discontinue allowing new allocations or transfers to any existing subaccounts. The Rider to the Annuity Contract provides that Lincoln "reserves the right to discontinue accepting new allocations or transfers to any of the available Guaranteed Periods at any time." Doc. No. 9-1 at 45 (emphasis added). The Rider is unambiguously part of the Contract because

6

the Annuity Contract states: "The Contract and any riders attached constitute the entire Contract," and "[t]his Rider is part of the Contract to which it is attached and is effective upon issue." Id. at 35, 45. The Rider provides that "[i]n the case of a conflict with any provision of the Contract, the provisions of this Rider will control." Id. at 45. Notably, there is no conflict between the Rider and the rest of the Annuity Contract, for nowhere does the Contract provide that any fixed subaccount will always be available for new allocations or transfers.

Other provisions of the Annuity Contract support this interpretation. For example, the Rider provides that "[t]he Guaranteed Period is selected by the Owner from those <u>made available by LNL at the time of selection</u>." Id. (emphasis added). It also provides that:

> LNL will send written notice to the Owner at the last address known to LNL regarding an upcoming expiration of a Guaranteed Period. . . . The Owner must provide a Notice, prior to the Expiration Date of a previously selected Guaranteed Period, to transfer all or a portion of the value of the amount in a Fixed Subaccount at the Expiration Date. . . . If no Notice from the Owner is received by LNL prior to the Expiration Date of a previously selected Guaranteed Period, a subsequent Guaranteed Period of the same duration, <u>if available</u>, will begin automatically upon the expiration of the preceding Guaranteed Period.
>
> If the Notice requests only a portion of the value of the Fixed Subaccount to be transferred, the remaining amount will be automatically invested in a subsequent Guaranteed Period of the same duration, <u>if available</u>, upon the expiration of the preceding Guaranteed Period.
>
> <u>In the event the preceding Guaranteed Period is no longer available</u> and no Notice has been received from the Owner, the value of the Fixed Subaccount will be transferred to a new Fixed Subaccount for a Guaranteed Period with the shortest duration currently available.

Id. at 46 (emphasis added).

Ivers contends that notwithstanding the Rider's explicit language providing that Lincoln "reserves the right to discontinue accepting new allocations or transfers to any of the available Guaranteed Periods at any time," Lincoln was nevertheless required to make at least one Fixed Subaccount available for new allocations. Doc. No. 20 at 19-20 ("LNL remained obligated to offer

at least one or perhaps more fixed subaccounts offering the 3% guaranteed fixed return."); id. at 23 ("If LNL were to maintain one or more fixed accounts, no inconsistencies arise with respect to the Contract's name, the text of the Contract, its describing Prospectus or within the Interest Adjustment Fixed Account Rider within the Contract."). To support his argument, Ivers contends that the word "any" in the phrase "the right to discontinue accepting new allocations or transfers to any of the available Guaranteed Periods," means "some, but not all." Id. at 8-9, 11.

This argument fails for two reasons. First, when used adjectivally, the plain and ordinary meaning of the word "any" includes "all." United States v. Gonzales, 520 U.S. 1, 5 (1997) ("Read naturally, the word 'any' has an expansive meaning, that is, 'one or some indiscriminately of whatever kind.'") (citing Webster's Third New International Dictionary 97 (1976)); Gentile v. BioGen IDEC, Inc., 934 F. Supp. 2d 313, 320 (D. Mass. 2013) (explaining that the phrase "'any [defendant] properly joined . . . who has been served,' where 'any' functions as an adjective, lends itself to the definition of 'any' as 'one, some, or all indiscriminately of whatever quantity.'") (quoting Webster's Third New International Dictionary 97 (3d ed. 1986)).

Second, other provisions of the Annuity Contract support the plain and ordinary meaning of "any" as encompassing "all" by making clear that specific guaranteed fixed subaccounts may not be available beyond the initial selection period. See, e.g., Doc. No. 9-1 at 46 ("If no Notice from the Owner is received by LNL prior to the Expiration Date of a previously selected Guaranteed Period, a subsequent Guaranteed Period of the same duration, if available, will begin automatically upon the expiration of the preceding Guaranteed Period."); id. ("[T]he remaining amount will be automatically invested in a subsequent Guaranteed Period of the same duration, if available, upon the expiration of the preceding Guaranteed Period."); id. ("In the event the preceding Guaranteed Period is no longer available . . . " (all emphasis added).

Ivers's reliance on the prospectus that describes Lincoln's annuity products, Doc. No. 20 at 9, is also unavailing, for it plainly states that "[y]our contract may not offer a fixed account or if permitted by your contract, we may discontinue accepting net purchase payments or transfers into the fixed side of the contract at any time." Doc. No. 27-4 at 2. In short, the prospectus warns that Lincoln might do exactly what it did do in this case: closing all of the fixed accounts to new allocations or transfers.

Ivers also contends that Lincoln previously apparently recognized the correctness of his interpretation of the contract:

> In response to Plaintiffs [sic] urging, from 2014 until 2017, LNL permitted Plaintiff to avail himself of another account [one made available by LNL] within the annuity, wherein Plaintiff was permitted to earn the 3% guaranteed interest rate. Plaintiff maintains that this act on LNL's part amounts to LNL's admission of the rectitude of Plaintiffs [sic] position . . . In January 2017, LNL restored the 3% guaranteed minimum interest rate account to Plaintiffs [sic] contract and Plaintiff immediately began to use that account. In December 2017, Defendant, on its own motion, removed Plaintiffs [sic] access to the 3% guaranteed minimum interest rate account. LNL has stated in writing to Plaintiff that its restoring Plaintiffs access to the guaranteed account was 'an error.'

Doc. No. 20 at 7. Lincoln has explained that it allowed Ivers to transfer funds into the 3% Fixed Account in 2017 because of a servicing error, and that it did not become aware of the error until November 2017 when Ivers attempted to transfer additional funds into the 3% Fixed Account. Doc. No. 20-2 at 31. Ivers was then informed that that Fixed Account was no longer available for new deposits or transfers. Id.

Whether Lincoln's action in allowing Ivers to transfer funds into the 3% Fixed Account in 2017 constituted an error, it does not constitute a waiver of Lincoln's contractual right to "discontinue accepting new allocations or transfers to any of the available Guaranteed Periods at any time." Doc. No. 9-1 at 45. Even if allowing Ivers to transfer funds into the fixed account earlier in 2017 had not been a mistake, Lincoln had the contractual right to discontinue such

9

allowance later that year if it so chose. Nothing in the act of permitting the transfer by Ivers suggests that Lincoln conceded it lacked the contractual authority to close the fixed account to new allocations or transfers. Its decision to do so does not constitute a breach of contract.

For these reasons, Iver's breach of contract claim fails as a matter of law.

### 2. Iver's Chapter 93A claim.

Although Ivers's complaint does not contain an express claim for the violation of Chapter 93A, Ivers sent Lincoln a 93A demand letter before filing his complaint and referenced the letter in his complaint. See Doc. No. 1-1 ¶ 1 (second); Doc. No. 1-4 (copy of 93A demand letter). The demand letter alleges that Lincoln has engaged in "breach of contracts, breach of fiduciary duty, and unfair, deceptive, and fraudulent behavior by having fraudulently removed the guaranteed accounts." Doc. No. 1-4 at 10.

Insofar as Ivers's Chapter 93A claim is based on the alleged breach of contract, Ivers's Chapter 93A claim necessarily fails to state a claim on this ground because the Court holds that Lincoln did not breach the Annuity Contract when it closed the Fixed Subaccounts to new allocations or transfers.

Ivers's Chapter 93A claim also fails because a breach of contract alone is insufficient to support such a claim. As the First Circuit has explained, "[i]t is well established that breach of a contract can lead to a violation of Chapter 93A. The simple fact that a party knowingly breached a contract does not raise the breach to the level of a Chapter 93A violation, however." Ahern v. Scholz, 85 F.3d 774, 798 (1st Cir. 1996) (citations omitted). To constitute an unfair or deceptive act, the objectionable conduct must be "in disregard of known contractual arrangements and intended to secure benefits for the breaching party," or must otherwise use the breach "as a lever to obtain advantage for the party committing the breach in relation to the other party; i.e., the

10

breach of contract [must have] an extortionate quality that gives it the rancid flavor of unfairness." Id. at 798-99 (citations omitted).  Because Ivers's complaint alleges no such conduct and there is no breach, it fails to state a viable Chapter 93A claim.

For these reasons, Lincoln's motion to dismiss Ivers's complaint (Doc. No. 8) is ALLOWED.

   B. Plaintiff's Motion for Summary Judgment (Doc. No. 12)

While Lincoln's motion to dismiss was pending, Ivers filed a motion for summary judgment that substantially repeats—at times verbatim—his opposition to Lincoln's motion.  See generally Doc. No. 12.  Because the Court has dismissed the complaint, Iver's motion necessarily fails.  Thus Ivers's motion for summary judgment (Doc. No. 12) is DENIED.

IV. CONCLUSION

For the foregoing reasons, the Court ALLOWS Defendant's motion to dismiss (Doc. No. 8), ALLOWS Plaintiff's motions to correct (Doc. Nos. 10, 11), DENIES Plaintiff's motion for summary judgment (Doc. No. 12), and ALLOWS Plaintiff's motion for leave to file a sur-reply (Doc. No. 24).  The Clerk shall close this case.

            SO ORDERED.

            /s/ Leo T. Sorokin
            Leo T. Sorokin
            United States District Judge